[No. F060251. Fifth Dist. May 24, 2012.]

ROCIO M. LANDEROS, a Minor, etc., et al., Plaintiffs and Respondents, v. GUSTAVO DAVALOS TORRES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. through V. of the Discussion.

COUNSEL

Horvitz & Levy, Stephen E. Norris, H. Thomas Watson; Gordon & Rees, Jewel Kolling Basse and Charles S. Custer for Defendant and Appellant.

Reed Smith, Margaret M. Grignon, Raymond A. Cardozo and Zareh A. Jaltorossian for Plaintiffs and Respondents.

OPINION

**CORNELL, J.**—Gustavo Davalos Torres appeals from a judgment entered in favor of Rocio M. Landeros (hereafter Landeros) and Marta L. Perez (sometimes hereafter plaintiffs).

The action arose out of an automobile collision that caused severe and permanent brain injuries to Landeros and significant but lesser injuries to Perez. Torres was intoxicated at the time of the collision. The jury awarded Landeros a total of $31,656,208 and awarded Perez $77,986.55.

The primary issue is whether Landeros was insured at the time of the collision within the meaning of Civil Code section 3333.4 (hereafter section 3333.4). If Landeros was uninsured, then section 3333.4 would prevent her from recovering $22 million in noneconomic damages awarded to her by the jury. The vehicle Landeros was driving was purchased and insured by her father, Miguel Landeros. Landeros was unlicensed at the time of the collision. As we shall explain, we conclude Landeros was insured as a permissive user under Miguel Landeros's insurance policy, notwithstanding her unlicensed status.

Torres also argues (1) the trial court erred in instructing the jury, (2) Landeros's counsel committed misconduct, and (3) the punitive damage award was not supported by substantial evidence because Landeros failed to provide meaningful evidence of Torres's financial condition. We reject each of these arguments and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

The facts related to the collision will be summarized briefly as they are not relevant to the issues on appeal.

Landeros suffered serious and permanent brain damage after the vehicle she was driving was struck by a vehicle driven by Torres. Perez was a passenger in the vehicle Landeros was driving. We focus on Landeros because the only issue related to the judgment in favor of Perez is the punitive damage award.

Landeros was in a coma for several weeks after the collision and spent over nine months in the Center for Neuro Skills, a specialized facility for people who have suffered a brain injury, where she received intensive therapy in an attempt to recover from her injuries.

Landeros, acting through her guardian ad litem Maria Landeros, and Perez filed a complaint containing causes of action for negligence and motor vehicle negligence. The complaint also sought punitive damages.

At trial, Torres admitted his negligence was the cause of the collision and the cause of Landeros's injuries. He also admitted (1) when he was tested three hours after the collision, his blood-alcohol content was 0.10 percent; (2) he pled no contest to charges he was driving while intoxicated; and (3) he

was sentenced to a term of 32 months in prison as a result of the conviction. Torres did not contest evidence that Landeros was permanently disabled, would never work, and would need assistance 24 hours a day, every day, for the rest of her life.

As a result of the stipulations, the issue at trial was damages. Even this issue was partially resolved as Torres stipulated that Landeros's reasonable and necessary past medical expenses were $1,106,208. Experts testified about Landeros's future medical needs, as well as accommodations necessitated by the injury to her brain.

On many of the issues the parties had only minor disputes. Landeros's counsel attempted to maximize Landeros's future needs, while defense counsel attempted to minimize those needs. The main points of contention were noneconomic damages and testimony by Landeros's experts that she would need 30 hours of occupational therapy a week for the rest of her life, at a cost of approximately $19 million.

Landeros's counsel requested $47 million in future economic damages. He also argued that Landeros's noneconomic damages should be compensated at $1 million per year for the rest of her life; but, because the value of money today is likely to be less than in the future, the award requested in today's dollars was $259,930,492. The total award requested for economic and noneconomic damages was $317 million.

Landeros also requested the jury award $26,000 in punitive damages. No attempt was made to explain how this figure was arrived at or the basis for this request.[1]

Torres's counsel argued the jury should award Landeros $5,351,046 in economic damages and $3.4 million for her noneconomic damages.

The jury awarded Landeros $1,106,208 in past economic damages, $7 million in future economic damages (reduced to present value), $1.1 million in lost earning capacity, $450,000 in homemaker expenses, $1 million in past

---

[1] Perez's attorney asked for $10 million in noneconomic damages. Torres's counsel argued that Perez should be awarded $30,000 for noneconomic damages, which did not include any damages for future noneconomic damages. The jury awarded Perez $37,986.55 in past economic damages and $40,000 in past noneconomic damages, for a total award of $77,986.55. There was no award for future noneconomic damages. The jury awarded Perez punitive damages of $1,400.

noneconomic damages, and $21 million in future noneconomic damages, for a total award of $31,656,208. The jury also awarded punitive damages of $13,000. Judgment was entered consistent with the verdict.

Torres made a motion for a judgment notwithstanding the verdict and a motion for a new trial. Both motions were denied. He appeals from the judgment entered on the verdict.

## DISCUSSION

I. *Section 3333.4*

*The Statute*

■    Section 3333.4, subdivision (a) precludes recovery of noneconomic damages incurred as a result of a motor vehicle accident when the injured plaintiff (1) was operating the vehicle in violation of Vehicle Code section 23152 (driving while under the influence of alcohol or drugs) or 23153 (causing injury while driving under the influence of alcohol or drugs), (2) owned the vehicle involved in the collision and the vehicle was not insured as required by the financial responsibility laws of California, or (3) was the operator of a vehicle involved in a collision and he or she could not establish his or her *financial responsibility as required by the financial responsibility laws* of California.[2] Torres contends Landeros operated the vehicle without insurance, in violation of section 3333.4, subdivision (a)(3), and therefore cannot recover noneconomic damages.

---

[2] Section 3333.4 states in full: "(a) Except as provided in subdivision (c), in any action to recover damages arising out of the operation or use of a motor vehicle, a person shall not recover non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement, and other nonpecuniary damages if any of the following applies: [¶] (1) The injured person was at the time of the accident operating the vehicle in violation of Section 23152 or 23153 of the Vehicle Code, and was convicted of that offense. [¶] (2) The injured person was the owner of a vehicle involved in the accident and the vehicle was not insured as required by the financial responsibility laws of this state. [¶] (3) The injured person was the operator of a vehicle involved in the accident and the operator can not establish his or her financial responsibility as required by the financial responsibility laws of this state. [¶] (b) Except as provided in subdivision (c), an insurer shall not be liable, directly or indirectly, under a policy of liability or uninsured motorist insurance to indemnify for non-economic losses of a person injured as described in subdivision (a). [¶] (c) In the event a person described in paragraph (2) of subdivision (a) was injured by a motorist who at the time of the accident was operating his or her vehicle in violation of Section 23152 or 23153 of the Vehicle Code, and was convicted of that offense, the injured person shall not be barred from recovering non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement, and other nonpecuniary damages."

*Relevant Facts and Procedure*

The vehicle Landeros was driving when the collision occurred was purchased by Miguel Landeros four days before the collision. He obtained insurance as required by California's financial responsibility laws and then provided the vehicle to Landeros for her use.[3] Landeros did not have a driver's license and had never taken any driver's training courses as required by law, nor had she obtained insurance on her own behalf.

Prior to trial, Torres moved the trial court to exclude any evidence that Landeros suffered noneconomic damages, arguing that she was precluded from doing so pursuant to section 3333.4. Landeros made several arguments in opposition to the motion, but the trial court found that section 3333.4 did not apply because Landeros was a permissive user of the vehicle under Miguel Landeros's insurance policy and thus was covered by insurance as required by California's financial responsibility laws.[4]

*Landeros's Status as a Permissive User*

■ Torres's argument, reduced to its essence, is that Landeros could not be a permissive user of the vehicle because she did not have a valid driver's license. We emphasize that the issue is whether Landeros would have had liability coverage for an accident in which she was at fault. The financial responsibility laws referred to in section 3333.4 require drivers and owners of vehicles to carry liability coverage with minimum limits as required by statute. (Veh. Code, § 16451.) The current statutory requirements are bodily injury limits of $15,000 per person per accident, $30,000 total per accident, and property damage limits of $5,000 per accident. (*Ibid.*) Since Torres stipulated that he was responsible for Landeros's injuries, the insurance policy obtained by Miguel Landeros was relevant only to the section 3333.4 issue.

We turn first to the language of Miguel Landeros's insurance policy. The first section in part I of the policy provides the liability coverage required by

---

[3] There is some confusion in the information provided by Miguel Landeros regarding ownership of the vehicle. In a declaration, he claimed that he purchased the vehicle and then gave it to Landeros, who was required to maintain the vehicle and make all payments on it. In his deposition, he denied that anyone besides himself had an ownership interest in the vehicle, but that Landeros had permission to drive the vehicle.

[4] The trial court rejected Landeros's assertion that she was the owner of the vehicle at the time of the accident.

California's financial responsibility laws. As relevant to our discussion, the policy states that the insurance company "will pay damages . . . up to the policy limits . . . for which an *insured person* is legally liable because of bodily injury or property damage resulting from the ownership, maintenance, or use of your insured car . . . ." (Italics added.)

The second section in part I is entitled "ADDITIONAL DEFINITIONS USED IN THIS PART ONLY" and defines an insured person, "with respect to your insured car," as "(1) you or any relative[;] [¶] (2) any other person using your insured car with your express or implied permission to do so and within the scope of your permission."

The policy defines "you" as the person named in the declarations page and his or her spouse. Miguel Landeros and his companion, Martha Isela Gonzalez, were named in the declarations page as named insureds. "Relative" is defined in the policy as "a person living in your household and related to you by blood . . . ." It is undisputed that while Landeros is Miguel Landeros's daughter, she was not living in his household. Therefore, Landeros was not covered under the policy as a named insured or as a relative.

Landeros, however, would be covered as a permissive user, unless the policy contained an exclusion eliminating coverage for an unlicensed driver. We reach this conclusion because the evidence indicates that Landeros was operating the vehicle with the permission of her father, and the definition of "insured person" quoted, *ante*, does not require a permissive user be licensed.

Our review of the insurance policy did not discover an exclusion that would eliminate coverage for unlicensed permissive users. Indeed, we could not find any reference to the issue. Nor has Torres cited to any policy provision excluding unlicensed drivers. Accordingly, we conclude there is no policy provision that would relieve the insurer from providing liability coverage for an accident where Landeros negligently operated the vehicle.

The insurance policy is consistent with Insurance Code section 11580.1, which mandates certain provisions be included in automobile insurance policies sold in California. Subdivision (b)(4) of Insurance Code section 11580.1 mandates coverage "to the same extent that insurance is afforded to the named insured, to any other person using the motor vehicle, provided the use is . . . with [the named insured's] permission, express or implied, and within the scope of that permission . . . ."

Relevant case law also supports our conclusion that Landeros, as a permissive user, was insured.

Permissive user coverage was the subject of *Wildman v. Government Employees' Ins. Co.* (1957) 48 Cal.2d 31 [307 P.2d 359] (*Wildman*). Elvaree Wildman was injured when a vehicle owned by Eusebio Bonifacio and Cecilia Bonifacio was negligently operated by Victoria Villaneuva. The insurance company issued a policy to the Bonifacios that covered the vehicle. The insurance company denied coverage for the accident, claiming the policy specifically excluded coverage when the vehicle was operated by anyone other than the Bonifacios or their immediate family members.

The Supreme Court rejected the insurance company's argument for two reasons. First, it concluded that the language on which the insurance company relied was ambiguous. Relying on the principle that ambiguities in an insurance policy are to be resolved against the insurer, the Supreme Court interpreted this ambiguous language as providing coverage for permissive users. (*Wildman, supra*, 48 Cal.2d at pp. 35–37.)

Second, the Supreme Court concluded that not only was the insurance policy ambiguous, but an attempt to exclude coverage for permissive users violated applicable statutes and California public policy. At the time of the accident, Vehicle Code section 415 required insurance policies for vehicles to insure " 'the person named therein *and any other person using or responsible for the use of said motor vehicle . . . with the express or implied permission of said assured.*' " (*Wildman, supra*, 48 Cal.2d at p. 38.) The Supreme Court held that "section 415 must be made a part of every policy of insurance issued by an insurer since the public policy of this state is to make owners of motor vehicles financially responsible to those injured by them in the operation of such vehicles. Section 402 of the Vehicle Code provides that 'Every owner of a motor vehicle is liable and responsible for the death of or injury to person or property resulting from negligence in the operation of such motor vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner, and the negligence of such person shall be imputed to the owner for all purposes of civil damages.' We are of the opinion that for an insurer to issue a policy of insurance which does not cover an accident which occurs when a person, other than the insured, is driving with the permission and consent of the insured is a violation of the public policy of this state as set forth in sections 402 and 415 of the Vehicle Code." (*Id.* at p. 39.)

The provisions in former Vehicle Code sections 402 and 415 referred to by the Supreme Court are now contained in Vehicle Code sections 16450, 16451, 17150 and in Insurance Code section 11580.1, confirming that the public policy of California has not changed.

This conclusion is supported by the Supreme Court's analysis in *Metz v. Universal Underwriters Ins. Co.* (1973) 10 Cal.3d 45 [109 Cal.Rptr. 698, 513 P.2d 922] (*Metz*). Richard Metz was injured in an accident with a vehicle operated by Gomer Hamlin. Hamlin had leased the automobile he was operating from National Auto Leasing Corporation (National). National was insured by Universal Underwriters Insurance Company. National's insurance policy covered all vehicles it owned and extended coverage to anyone using a vehicle it owned with its permission, either express or implied. The insurance company denied liability for the accident, relying on a policy provision that excluded coverage for any automobile rented to another person by National.

The Supreme Court identified the issue as whether the exclusion on which the insurance company relied conflicted with the permissive user requirements in the Insurance Code.[5] (*Metz, supra,* 10 Cal.3d at p. 51.) The insurance company conceded that a provision excluding coverage of renters would be void as excluding a class of users in violation of the Insurance Code, but argued the exclusion applied to a class of automobiles (leased vehicles), not a class of users. (*Metz,* at p. 51.)

The Supreme Court rejected this distinction. "The right of the insurer to limit its coverage of automobiles, however, does not go so far as to permit the insurer by adroit wording to evade the statutory requirement for coverage of permissive users. [Citation.] For example, a policy which excluded automobiles 'when operated by a permissive user' would be clearly seen as an exclusion of persons, not vehicles and void under" the Insurance Code. (*Metz, supra,* 10 Cal.3d at p. 52, fn. omitted.) The Supreme Court concluded, "We have uniformly held that 'the *entire* automobile financial responsibility law must be liberally construed to foster its main objective of giving "monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others." ' [Citations.] Applying this principle of construction, we conclude that [Insurance Code] section 11580.1, subdivision [(b)], did not merely proscribe policy provisions which by their terms exclude coverage for permissive users, but also invalidated provisions which, by defining a class of excluded vehicles in terms of their operation by permissive users, serves effectively to deny coverage to those users. We hold that [the insurance company's] exclusion of automobiles 'while rented to

---

[5] At the time the policy was written, the requirement that coverage be provided for permissive users was found in Insurance Code section 11580.1, former subdivision (d), which was repealed in 1970 (Stats. 1970, ch. 300, § 3, p. 573). That same year similar language requiring coverage for permissive users was added to section 11580.1 as subdivision (b)(4) (Stats. 1970, ch. 300, § 4, pp. 573–574), where it currently is found. (*Metz, supra,* 10 Cal.3d at p. 48, fn. 1.)

others' conflicts with Insurance Code section 11580.1, subdivision [(b)], and is therefore ineffective to limit coverage of Hamlin." (*Id.* at p. 53, fn. omitted.)

These cases unequivocally establish that California has a strong and long-standing public policy that requires insurance policies to provide coverage for permissive users, and any attempt to limit that coverage will be rejected. This conclusion is supported by several cases decided before *Wildman.*

In *Fagiani v. General Acc. etc. Assur. Corp.* (1930) 105 Cal.App. 274 [287 P. 377] (*Fagiani*), Celeste Bennett was driving a vehicle that struck and injured the plaintiff. The insurance company had issued an automobile insurance policy to Celeste Bennett's husband, W.A. Bennett, which covered the vehicle involved in the accident. This policy included a provision that extended coverage " 'to any person or persons while riding in or legally operating any of the automobiles described in the declarations . . . provided such use or operation is with the permission of the named assured . . . .' " (*Id.* at p. 275.) Celeste Bennett was driving the vehicle with her husband's permission but did not have a driver's license. The insurance company denied coverage because it contended Celeste Bennett was not operating the vehicle legally since she did not have 'a driver's license. The appellate court concluded the term "legally operating" was ambiguous.

"The only question presented by appellant is whether Celeste Bennett was 'legally operating' the automobile within the meaning of the quoted words as used in the policy, she not having been licensed to drive any automobile. Under a liberal definition of the term, one is not 'legally operating' an automobile when he is driving it in violation of any provision of law, but obviously the term was not used in that broad sense in the policy in question, because to give it that meaning would be to destroy the protection which the policy purports to give to persons driving the automobile with the permission of the owner. It is a matter of common knowledge that nearly every automobile accident is due to a breach of some statutory provision. In *Firemen's Fund Ins. Co.* v. *Haley* [(1922)] 129 Miss. 525 [92 So. 635], it is said that, where there is nothing in the policy exempting the insurance company from liability because of the violation of the highway laws, 'if such a defense were permissible in this state, automobile insurance would be practically valueless.' In *Messersmith* v. *American Fidelity Co.* [(1921)] 232 N.Y. 161 [133 N.E. 432], Cardozo, J., delivering the opinion of the court, said: 'To restrict insurance to cases where liability is incurred without fault of the insured would reduce indemnity to a shadow. . . . Liability of the owner, who is also the operator, can never be incurred without fault that is personal. Indeed, the statute has so covered the field that it can seldom, if ever, be incurred without fault that is also crime.'

"The foregoing considerations are to be kept in mind in construing the uncertain terms of a policy under which the insurer claims exemption from liability. 'Legally operating' an automobile, in common parlance, relates to the manner of its operation rather than to authorization to operate it, although, as stated, in a broader sense the term may include both. It is not to be presumed that by the provision of the policy in question it was intended to give a mere shadow of protection to persons driving the automobile with permission of the owner. That it was not so intended is indicated by other provisions of the policy. Under the terms thereof the defendant could not escape liability to the owner on the mere ground that he was driving the automobile at the time of the accident without an operator's license, or that it was driven, with the owner's knowledge, by his unlicensed agent, or liability to any other person 'legally responsible for the operation thereof' while it was driven by such person's unlicensed agent. If the automobile had been driven at the time of the accident by an unlicensed agent of Celeste Bennett, she knowing him to be unlicensed, the defendant would be liable to her in the same manner as if such agent had been duly licensed.

"If it was the intention to exempt the defendant from liability under circumstances such as are involved herein, one would naturally expect such exemption to be included in the express statement of 'Exclusions.' All of such exclusions are made applicable alike to the 'named assured' and the 'additional assureds' and no reason appears for requiring an operator's license as a condition of liability to one assured and not to the others. Undoubtedly an insurer might make such a distinction in its policy of insurance, but the fact that there is no apparent reason for the distinction may be considered in determining the meaning of an uncertain term of the policy. It is not necessary to determine what was intended by the use of the term 'legally operating,' but it is sufficient to show that it is uncertain whether it was the intention of the parties to the contract to give it the meaning for which appellant contends." (*Fagiani, supra*, 105 Cal.App. at pp. 275–277.)

After reaching this conclusion, the appellate court applied the rule that exclusions in insurance policies must be strictly construed against the insurer and held the policy provided coverage for the accident. (*Fagiani, supra*, 105 Cal.App. at p. 277.)

*Fagiani* found coverage for an unlicensed permissive user where the policy required that permissive users be operating the vehicle legally. Miguel Landeros's insurance policy likewise provided coverage for permissive users, but it did not require that the permissive user be operating the vehicle legally. Therefore, there is no basis for concluding that an unlicensed permissive user is excluded from coverage.

Another case that supports our analysis is *Firkins v. Zurich Gen. A. & L. Ins. Co.* (1931) 111 Cal.App. 655 [295 P. 1051] (*Firkins*). Mr. and Mrs. Delmuto purchased a policy of insurance from the insurance company to cover their vehicle. When purchasing the policy, the Delmutos informed the insurance company's agent that they did not drive and would not drive the vehicle. Instead, their 14-year-old son, who had a driver's license, would drive the vehicle. The Delmutos informed the agent that they wanted insurance to cover the vehicle while driven by their son. (*Id.* at p. 656.)

An accident occurred while the vehicle was driven by the son, and the insurance company denied coverage, relying on an exclusion in the policy that stated, " 'This policy shall not cover in respect of any automobile, . . . while driven or manipulated by any person under the age fixed by law, or under sixteen years of age in any event.' " (*Firkins, supra,* 111 Cal.App. at p. 656.) However, the policy also had a provision providing coverage for permissive users that stated, "The policy . . . is hereby *extended* to apply to any person . . . legally responsible for the operation thereof, provided such use or operation is with the permission of the named assured . . . .' " (*Ibid.*) The appellate court construed the contract in a manner consistent with the intent of the parties. "It may be reasonably construed to mean that the surety company shall not be liable upon the policy 'while [the vehicle was] driven or manipulated by any person . . . under sixteen years of age' unless such minor was operating the car 'with the permission of an adult member of the named assured's household', in which event the company is liable. To construe the language of this instrument otherwise would defeat the apparent intent of the parties and render the quoted language of the [permissive user provision] valueless." (*Firkins, supra,* 111 Cal.App. at p. 658.) *Swift v. Zurich Gen. Acc. & L. Ins. Co.* (1931) 112 Cal.App. 709, 711–712 [297 P. 578] reached the same conclusion, even though there was no evidence the insurance company had been informed the vehicle would be driven by a minor.

This review establishes that California has a long-standing policy of requiring automobile insurers to extend coverage to permissive users because it is the public policy of our state to broaden "insurance coverage to protect the public when the automobile to which the policy relates is operated by one other than the insured owner." (*Uber v. Ohio Casualty Ins. Co.* (1967) 247 Cal.App.2d 611, 616 [55 Cal.Rptr. 720].) Therefore, both statutory and legal precedent strongly suggests the insurance policy issued here to Miguel Landeros not only provided liability coverage for permissive users, but it also provided liability coverage for unlicensed permissive users, so long as he or she was using the insured vehicle with Miguel Landeros's permission.

*Honsickle v. Superior Court*[6]

Torres argues that an unlicensed driver cannot be covered by an insurance policy for a variety of reasons. First, he asserts that Landeros could not be insured because, as an unlicensed driver, she lawfully could not purchase an automobile insurance policy. Second, Torres argues that we should construe section 3333.4 broadly to prohibit recovery of noneconomic damages by unlicensed drivers because they cannot procure insurance.

To support his first argument, Torres relies on *Honsickle*. This reliance is misplaced.

Honsickle negligently operated his vehicle, causing a collision with a vehicle driven by Iwona Wysocki. Wysocki was an immigrant from Poland who entered this country on a tourist visa. She had petitioned for permanent resident status but, at the time of the accident, the petition had not been approved. Since she could not establish her presence in the United States was authorized under federal law, she could not obtain a driver's license. (Veh. Code, § 12801.5, subd. (a).) Wysocki's husband had purchased insurance for the vehicle Wysocki was driving at the time of the accident. He also had requested liability coverage for Wysocki. Because Wysocki was unlicensed, the insurance company refused to insure her and added an endorsement to the policy stating that no coverage would be provided while she was operating the vehicle. (*Honsickle, supra,* 69 Cal.App.4th at p. 760.)

The appellate court concluded that section 3333.4 precluded Wysocki from recovering noneconomic damages because she was uninsured at the time of the accident. (*Honsickle, supra,* 69 Cal.App.4th at p. 768.) "[Wysocki] knew she was violating the law every time she drove without a valid driver's license. The whole purpose of Proposition 213 would be undercut, if not entirely negated, by creating an exemption for an unlicensed person. [Wysocki], who deliberately and knowingly violated traffic-related laws both before and after the passage of Proposition 213, is exactly the type of person the electorate intended to bar from recovering noneconomic damages." (*Id.* at p. 766.)

We agree with the appellate court's conclusion in *Honsickle*. Under the facts of that case, Wysocki was an uninsured motorist and exactly the type of person at whom section 3333.4 was directed. We find *Honsickle* distinguishable, however, because Wysocki was specifically excluded under her husband's insurance policy, while Landeros was not excluded by the policy obtained by Miguel Landeros. Indeed, as discussed *ante*, Landeros was insured under her father's policy as a permissive user.

---

[6] *Honsickle v. Superior Court* (1999) 69 Cal.App.4th 756 [82 Cal.Rptr.2d 36] (*Honsickle*).

Torres relies on two comments in *Honsickle* to support his argument. In the opinion the appellate court stated that Wysocki could not obtain liability coverage because she was unlicensed and stated that "An application for insurance coverage for an unlicensed driver is an absurdity on its face." (*Honsickle, supra*, 69 Cal.App.4th at pp. 760, 766.) Both statements are dicta and not controlling as authority here.

Torres's argument must be rejected for at least two reasons. First, *Honsickle* cites no authority for its assertions about unlicensed drivers being unable to obtain insurance. We give little weight to an "isolated and unsupported statement" that is "not supported by any reasoning, analysis or authority." (*Honsickle, supra*, 69 Cal.App.4th at p. 765.) Aside from *Honsickle*, Torres has not cited any statute or case that would support this assertion. Since this proposition is the lynchpin of Torres's argument, we presume the failure to cite any authority beyond *Honsickle* is because none exists.

Second, we are not concerned with whether Landeros could have purchased an insurance policy at the time of the collision. Even if it is correct that Landeros could not have done so because she was unlicensed, it is undisputed that she did not purchase insurance, nor did she attempt to do so. Therefore, whether she could have done so is irrelevant. The issue is whether she was insured as a permissive user under the liability policy purchased by her father. *Honsickle* does not address this issue.

### Failure to Pay Premiums for Coverage

We also reject Torres's assertion that neither Landeros nor her father paid a policy premium to cover the risk of Landeros's use of the vehicle. The policy purchased by Miguel Landeros included coverage for permissive users. Presumably, his insurer included a premium for this coverage. We note that the declarations page for Miguel Landeros's policy indicated that he and his companion owned three vehicles, yet there were only two drivers listed on the policy. These facts should have put the insurance company on notice that the vehicle may well have been driven by a permissive user. Moreover, the insurance company should have known that under California law, even unlicensed drivers are included within the definition of "permissive user." Since there is no evidence in the record about what information Miguel Landeros provided to the insurance agent, it may well be that the insurance company was informed fully of the use to which this vehicle would be put. In any event, there is no evidence to support Torres's assertion that Miguel Landeros did not pay a premium for coverage for permissive users.

### Insurance Company Would Have Excluded Coverage for Landeros

Similarly, there is no evidence in the record that had Miguel Landeros informed his insurer that Landeros was to be the primary driver of the vehicle

the insurer would have issued an endorsement specifically excluding her as an insured under the policy, as was done in *Honsickle*. Therefore, Torres's argument is based on speculation.

*Policy Obtained Through Fraud*

Torres also argues that because Miguel Landeros obtained the insurance policy through fraudulent representation to his insurance agent, the policy was void from its inception. We repeat, there is no evidence in the record about what information was provided to the insurance company or its agent, so this argument is without any evidentiary support.

Second, the right to declare the insurance policy obtained by Miguel Landeros void was a right belonging to the insurance company, not Torres. Torres did not cite any authority to suggest he has standing to have the policy voided, nor are we aware of any. The undisputed evidence is that at the time of the collision the policy was in effect. Therefore, this argument is based on speculation about what the insurer may have done *if* Miguel Landeros misrepresented facts to the insurance company when he applied for the policy.

Finally, the Supreme Court rejected this argument in *Barrera v. State Farm Mut. Automobile Ins. Co.* (1969) 71 Cal.2d 659 [79 Cal.Rptr. 106, 456 P.2d 674] (*Barrera*). Barrera obtained a judgment against Mr. and Mrs. Alves as a result of an accident wherein a vehicle driven by Mrs. Alves injured Barrera. Mr. Alves had obtained an insurance policy on the vehicle Mrs. Alves was driving. When notified of the accident, the insurance company rescinded the insurance policy and returned all premiums paid to Mr. Alves. The basis for the rescission was that on the application for insurance it was represented that Mr. Alves's driver's license had not been suspended in the preceding five years, when in fact it had been suspended within that timeframe.

The Supreme Court concluded the misrepresentation was a sufficient concealment to justify rescission, even if the misrepresentation was inadvertent. (*Barrera, supra,* 71 Cal.2d at p. 665, fn. 4.) The application, however, was signed and the policy issued approximately two years before the accident. The insurance company did not commence any investigation into the application until after the accident occurred. The Supreme Court held the insurance company could not deny coverage because it had failed to check the application within a reasonable time period.

"[The insurance company's] investigative practices may fail to conform to the standard of service which the public may reasonably expect of an insurance company and, more importantly here, may violate the public policy underlying California's Financial Responsibility Law. As we explain hereinafter in more detail, the 'quasi-public' nature of the insurance business and the public policy underlying the Financial Responsibility Law . . . impose upon the automobile liability insurer a duty both to the insured and to the public to conduct a reasonable investigation of insurability within a reasonable time after issuance of an automobile liability policy. We may characterize this duty as one sounding either in tort or quasi-contract. The label is not important. We hold, however, that in order to avoid liability to an innocent victim of the insured an insurer cannot take advantage of a breach of its duty reasonably to check an application for automobile liability insurance within a reasonable time after acceptance of that application." (*Barrera*, at pp. 667–669, fns. & citation omitted.)

The Supreme Court went on to explain why the practice of delaying investigation into the insurability of a risk violated the public policy underlying California's financial responsibility law.

"A rule which would permit an automobile liability insurer indefinitely to postpone determination of the validity of a liability policy and to retain its right to rescind the policy in the absence of the filing of a suit against it by a judgment creditor of the insured, defeats not only the public service obligations of the insurer but also the basic policy of the Financial Responsibility Law. That law aims 'to make owners of motor vehicles financially responsible to those injured by them in the operation of such vehicles.' [Citation.] Thus we have uniformly held that 'the *entire* automobile financial responsibility law must be liberally construed to foster its main objective of giving "monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others." ' [Citation.] As we concluded in *Interinsurance Exchange* [*v. Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 153 [23 Cal.Rptr. 592, 373 P.2d 640]], 'The pattern is clearly discernible: a desire on the part of the judiciary and the Legislature to not only prevent the astronomical accident toll in this state, but also to provide compensation for those injured through no fault of their own.' [Citation.]" (*Barrera, supra,* 71 Cal.2d at pp. 670–671, fns. omitted.)

We recognize that here Miguel Landeros purchased the insurance policy only four days before the collision in which Landeros was injured, and that it may be unreasonable to expect an insurance company to conduct an investigation in such a short timeframe. There is no evidence in the record, however, that the insurance company sought to rescind the policy issued to Miguel

Landeros. Moreover, the testimony in *Barrera* establishes the potential significance of the type of testimony that could have been obtained in this case. The insurance agent in *Barrera* testified that whenever he gave a binding receipt to the insured, the insurance company provided insurance for 30 days, even when it subsequently refused to approve the risk. (*Barrera, supra,* 71 Cal.2d at p. 666.) If Miguel Landeros's insurance company followed the same policy, then Landeros would have been insured at the time of the collision as a permissive user, regardless of the claimed misrepresentation. The absence of any testimony from Miguel Landeros's insurance agent or insurance company underscores the complete lack of evidentiary support for Torres's arguments.

### *Public Policy*

Torres's briefs reveal a common theme we believe is the true basis for his argument. Torres repeatedly asserts that because Landeros was unlicensed, she could not obtain insurance, and therefore section 3333.4 precludes recovery of noneconomic damages. This argument, in reality, is a request that we add a new exclusion to section 3333.4, one based on whether the injured driver properly was licensed. Torres argues the public policies that resulted in the passage of Proposition 213 and the enactment of section 3333.4 also support a limitation on recovery of damages for unlicensed drivers.

We disagree for a variety of reasons, but need identify only two. First, our task is to interpret the laws enacted by the Legislature and the ballot initiative process. We do this by ascertaining the intent of the Legislature so as to give effect to the purpose of the law. (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) We are guided primarily by the words of the statute, giving them their ordinary meaning, and look to outside sources only if the statute is ambiguous. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

Section 3333.4 does not contain any reference to unlicensed drivers. Therefore, we may resolve this issue based on the words of the statute itself with no need to rely on the intent of the Legislature or the supporters of Proposition 213. Since the words of the statute do not preclude unlicensed drivers from recovering noneconomic damages if they are insured under a policy of insurance, we must reject Torres's argument.

Moreover, the intent of the supporters of Proposition 213 is obvious—to encourage all drivers to obtain insurance by penalizing uninsured drivers.

(*Hodges v. Superior Court* (1999) 21 Cal.4th 109, 115 [86 Cal.Rptr.2d 884, 980 P.2d 433] [primary purpose was to limit insurance claims by uninsured motorists who contribute nothing to insurance pool].) Therefore, when analyzing section 3333.4 issues, the question is the existence of insurance, not whether the injured driver was licensed. Whether section 3333.4 should be amended to preclude unlicensed drivers from recovering noneconomic damages, or whether the Insurance Code should be amended to preclude insurance coverage for permissive users who are unlicensed, are issues to be addressed by the Legislature.

Second, Torres urges us to focus only on section 3333.4 and the goals that statute was intended to achieve when it was enacted through the initiative process. The public policy established thereby, according to Torres, must take precedence in this case. His error, however, is to ignore the long-established policy of this state requiring automobile drivers to be responsible financially for negligently caused damages and the decisions of the Supreme Court and the Legislature to further this policy by requiring every automobile insurance policy to include coverage for permissive users, including unlicensed permissive users. To exclude unlicensed drivers from permissive user coverage, or to prevent unlicensed drivers from recovering noneconomic damages, would require an examination and weighing of the policies of each law, a task for which the Legislature is better suited than this court.

### Conclusion

■ The plain meaning of section 3333.4 limits our inquiry to whether Landeros was a permissive user under the insurance policy purchased by her father. The insurance policy, Insurance Code section 11580.1, and the case law leaves no doubt that Landeros was included as a permissive user of the vehicle, even though she did not have a driver's license. Accordingly, the trial court correctly concluded that section 3333.4 did not apply and that Landeros was eligible to recover her noneconomic damages.[7]

II.–V.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7] On May 15, 2012, after oral argument, counsel for Landeros filed a request that we take judicial notice of the contents of the ballot materials that were before the voters when they voted on Proposition 213, now section 3333.4. We deny that request.

[*] See footnote, *ante*, page 398.

## DISPOSITION

The judgment is affirmed. Costs are awarded to Landeros and Perez. The matter is remanded to the trial court for consideration of Torres's motion for relief pursuant to Code of Civil Procedure section 473, subdivision (b). Landeros's request that we take judicial notice of the ballot materials before the voters when they voted on Proposition 213 is denied.

Wiseman, Acting P. J., and Kane, J., concurred.

A petition for a rehearing was denied June 20, 2012, and appellant's petition for review by the Supreme Court was denied August 8, 2012, S203761.